**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 17-cr-236-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

**1.    AARON MICHAEL KENDALL,**

     Defendant.

---

**ORDER DENYING MOTION TO SUPPRESS**

---

The Government charges Defendant Aaron Michael Kendall ("Kendall" or "Defendant") with distribution of a controlled substance, 21 U.S.C. § 841(a)(1); possession of a firearm as a felon, 18 U.S.C. § 922(g)(1); and possession of a firearm during and in furtherance of drug trafficking, 18 U.S.C. § 924(c)(1)(A). (ECF No. 1.) Kendall filed a Motion to Suppress ("the Motion") arguing that the firearm and drugs in question were discovered as part of an unconstitutional inventory search. The Court held an Evidentiary Hearing on November 6, 2018, and a Supplemental Evidentiary Hearing on January 31, 2019. For the reasons explained below, the Court denies the Motion.

## I.  BACKGROUND

### A.    Traffic Stop of Kendall

On January 31, 2017, around 7:04 p.m., Officer Rezac of the Wheat Ridge, Colorado Police Department ("WRPD") observed a Honda with a malfunctioning tail light near West 44th Avenue and North Wadsworth Boulevard. (ECF Nos. 33; 37.)

Officer Rezac turned on his emergency lights to stop the vehicle. The vehicle slowed to approximately 10 miles per hour but continued westbound on 44th Avenue, passing several parking lots and other opportunities to pull over the vehicle. Office Rezac reported seeing Kendall lean back and forth toward the passenger seat and waive his left hand outside the vehicle. (Evidentiary Hr'g Tr. at 9:49, Nov. 6, 2018 ("Nov. Tr.").) Officer Rezac called dispatch for additional information about the vehicle, and was informed that the license plate was registered to an Acura. (*Id.* at 9:48.) Officer Rezac suspected that the vehicle had been stolen and called for backup.

Officers Cotten and Levan, both of WRPD, joined Officer Rezac in their own patrol cars. When Kendall eventually stopped the vehicle on the 4300 block of Carr Street, they performed a felony stop. (*Id.* at 9:50; Supplemental Evidentiary Hr'g Tr. at 13:51, Jan. 31, 2019 ("Jan. Tr.").) At this point, Officer Levan activated his body camera. (ECF No. 62 ("Body Cam.").)[1] The officers ordered Kendall out of the vehicle and placed him in temporary custody in the backseat of Officer Rezac's patrol car. (Jan. Tr. at 13:51.) Officer Rezac read Kendall his Miranda rights from a WRPD-issued card, and Kendall waived them. (ECF No. 37 at 2; Nov. Tr. at 9:51.)

The officers learned Kendall's identity and determined that he did not have a current, valid driver's license. (Nov. Tr. at 9:52.) The officers checked the vehicle identification number with dispatch and determined that the vehicle had not been reported stolen. Kendall told Officer Rezac that he was in the process of buying the car from a friend, Carol Mathews, who was the registered owner of the vehicle. He also

---

[1] All times listed for the body camera footage correspond to the minute and second of the video, not the clock in the upper right corner of the footage.

told the officers that he did not have insurance on the car, but later claimed that his wife had it. He did not, however, produce any evidence of insurance. The officers called Matthews twice, once from Officer Rezac's phone and once from Kendall's phone (with Kendall's consent). They did not reach Matthews. (*Id.* at 9:55.) Officers also called Kendall's wife to confirm whether the vehicle was insured, but did not reach her. (*Id.* at 9:52–53.)

In deciding whether to tow a vehicle, Officer Rezac generally takes into account "the condition of the vehicle, where it [was] parked, if there [was] anyone responsible that can come collect the vehicle, if the vehicle is insured, if it has a valid driver, [and] if it [was] even able to be operable at all." (*Id.* at 9:41.) In this circumstance, Officer Rezac decided to impound the car in part because having an uninsured vehicle on the roads, particularly with a driver without a valid license, endangered public safety and no alternative driver could be contacted. (*Id.* at 9:53–54.). Officer Rezac then called and asked his sergeant for permission to tow the vehicle, and the sergeant advised that he could do so. (*Id.* at 9:56.) At that time, Kendall was in custody for driving with an expired license, was unable to show proof of insurance, and the registered owner could not be contacted. (*Id.* at 9:52–53.)

While Officer Rezac was in the process of writing a traffic summons charging Kendall with Driving a Vehicle with a Defective Tail Lamp, Driving a Vehicle Without a Valid Driver's License, and Failure to Display Evidence of Insurance, Officer Cotten started an inventory search of the vehicle. (ECF No. 33 at 1; ECF No. 37 at 4.) Office Cotten found a counterfeit $20 bill and informed Officers Rezac and Levan. (Body

3

Cam. at 32:25.)  At that point, Officer Rezac placed Kendall under arrest.  (*Id.* at 34:20.)

Officer Rezac then transported Kendall to the WRPD on suspicion of a felony forgery

offense.  (*Id.* at 9:57, 11:11.)

After the inventory search (detailed below), Matthews returned the phone call

while the vehicle was being loaded onto the tow truck (but prior to it being towed).  (ECF

No. 37 at 4.)  She confirmed that the vehicle was not stolen, that she had recently sold

the vehicle to Kendall, and that she still possessed the title because Kendall had not yet

paid in full for the car.  (*Id.*)  Officer Cotten told Matthews that the vehicle was being

towed to Connolly's Towing, Inc., a local tow shop and impound yard.  (*Id.*)  The

Government states that there is no indication that Matthews attempted to stop the

towing, nor did she offer to come to the scene to retrieve the vehicle.  (*Id.*)

**B.      Inventory Search of the Vehicle**

1.      *Drugs Under the Center Console*

As part of the inventory search, Officer Cotten searched the center console for

valuables.  During that search, he located a small clear plastic bag containing a white

crystal substance (consistent with methamphetamine) and two clear plastic bags

containing a black substance (consistent with heroin).[2]  (*Id.* at 3.)  The bags of drugs

were located beneath the center console.  (ECF No. 42 at 1.)  Kendall contends that the

discovery of the drugs in the center console was only possible after the officer removed

a panel at the bottom of the console "designed to give a person access to the inner

---

[2]  Officer Cotten later completed a field drug test on the suspected methamphetamine
and heroin and received a presumptive positive reading.  The drugs were then sent to the
Jefferson County Regional Crime Laboratory for forensic testing, which confirmed that the
substances were indeed methamphetamine and heroin.  (ECF No. 37 at 5.)

workings of the car" and that the area where the drugs were found was "not designed for storage."  (*Id.*)

Officer Cotten testified that when he initially opened the console, he removed a CD, phone, and napkins.  (Jan. Tr. at 13:53–54.)  After doing so, he noticed that the bottom of the console was "ajar" and not affixed.  (*Id.* at 13:44; Nov. Tr. at 10:45, 11:21–22.)  He noticed a "small plastic bag," sticking out from beneath the panel at the bottom of the console.  (Nov. Tr. at 10:46; Jan. Tr. at 13:45, 13:53–54.)  Officer Cotten stated that he used "no force at all" to remove the bottom panel because it was "essentially just removing the lining that is sitting right on top of it."  (Jan. Tr. at 13:45.)  He did not have to pry up the bottom or use any tool to access the compartment.  (*Id.*)

After Officer Cotten discovered the drugs, Officer Lovan looked in the compartment and used his body camera to videotape himself raising the bottom panel.  (*Id.* at 13:25.)  Consistent with Officer Cotten's testimony, it appears in the video that Officers Cotten or Lovan applied only minimal, fingertip force to gently raise the bottom of the center console.  (Body Cam. at 38:08–39, 40:31–52.)  From the camera footage, the front portion of the center console is ajar and, when lifted, the drugs are clearly visible.

Shortly thereafter, Officer Lovan's shift ended and another officer arrived to assist Officer Cotten with the remainder of the inventory search.  At this time, Officer Lovan stopped his body camera.  (*Id.* at 42:50–57.)

2.  *Gun Behind the Panel Below the Glove Compartment*

Almost immediately after finding the counterfeit $20 bill that led to Kendall's

arrest, Officer Cotten also found a belly holster, a type of firearm holster typically used for the concealed carry of a firearm or by law enforcement, on the front passenger seat. (Jan. Tr. at 13:55–56; Body Cam. at 32:41.) There was no firearm in the holster, leading the officers to suspect that a firearm was stowed somewhere in the vehicle and prompting them to search places where a firearm could be stored. (Jan. Tr. at 13:31, 13:56.) It also caused the officers to be concerned for public and officer safety to have a weapon stowed somewhere in an unattended vehicle slated to be towed. (*Id.* at 13:31–32, 13:57.)

While Officer Cotten was searching underneath the passenger seat during the inventory search to find items of value, he turned his head to the right and looked at the underside of the panel below the glove compartment. (*Id.* at 13:41.) He noticed that the panel below the glove compartment was not flush with the other paneling, was hanging down slightly, and appeared to have been tampered with. (*Id.* at 13:42; Nov. Tr. at 10:50.) Because he had found the empty gun holster on the passenger seat, Officer Cotten suspected that the firearm could be in the vicinity of the passenger seat. (Nov. Tr. at 10:51.)

Officer Cotten testified that he "tugged" the bottom of the loose portion of the panel below the glove compartment, which revealed the butt of a handgun. (*Id.* at 10:52.) He clarified that the amount of force used to reveal the handgun was "slight pulling" and "not prying." (*Id.* at 10:53.) Officer Cotten stated that he recognized the item as the butt of a handgun "almost immediately." (*Id.*) Thereafter, he "pulled slightly harder" on the panel below the glove compartment to retrieve the weapon. (*Id.*) Officer

Cotten located a Sig Sauer P226 9mm handgun with an extended magazine clip. (ECF No. 37 at 4.) He subsequently learned that the firearm had been reported stolen. (*Id.*)

Officer Lovan left before Office Cotten discovered the firearm. However, Officer Lovan's body camera captured several angles of the panel below the glove compartment from outside the car. From that angle, nothing appeared to be amiss. (Jan. Tr. at 13:41.) Indeed, Officer Lovan testified that he did not notice anything from outside the vehicle or upon reviewing the video, although he also noted that the car windows were dirty and difficult to see through. (*Id.* at 13:32–33.) Nor did Officer Lovan notice whether the panel below the glove compartment was loose when he looked inside the vehicle at the center console. (*Id.* at 13:37.)

      3.    *Other Items in Backpack and Vehicle*

Officer Cotten also searched a black backpack sitting on the passenger seat. Inside, he found a black box with two empty syringes, empty plastic bags, a small bag containing red and white pills, a small plastic container with yellow pills, and other drug paraphernalia. (ECF No. 33 at 2; ECF No. 37 at 4.) The officers also found a number of smartphones in the vehicle. By checking the serial number, the officers discovered that one of the smartphones had been reported stolen. (ECF No.37 at 3.)

**C.    WRPD Inventory Search Policy**

WRPD maintains a policy (the "Policy") on towed, abandoned, and impounded vehicles. (ECF No. 37-2.) The purpose of the Policy is "to safeguard the vehicle and its contents, to facilitate public safety, or to lawfully seize the vehicle and its contents for evidentiary purposes." (*Id.* § 9.45.01.) The Policy defines a disabled motor vehicle as

"a motor vehicle which is temporarily inoperable, either attended or unattended, upon a public right-of-way." (*Id.* § 9.45.02.) It does not further define "temporarily inoperable."

As relevant here, the Policy states the following with respect to towing:

> 9.45.03 WHEN VEHICLES MAY BE TOWED
>
> A.    A vehicle may be towed under the following circumstances:
>> 1.    The driver, and sole occupant, of a vehicle is arrested, injured, or otherwise incapacitated.
>> 2.    A disabled vehicle constitutes a hazard.
>> . . .
>> 4.    The condition of a vehicle or the manner in which it is equipped precludes safe operation on a public roadway.
>> . . .
>> 6.    The vehicle is uninsured.

(*Id.* § 9.45.03.) The Policy also states:

> 9.45.04 REMOVAL AND TOWING OF VEHICLES FROM PUBLIC AND PRIVATE PROPERTY
>
> A.    The officer shall determine if the abandoned or disabled vehicle has been reported stolen, is on public or private property or presents an immediate traffic hazard requiring the vehicle to be towed.
>> a.    If the vehicle is disabled and the owner/driver is present, at the discretion of the officer, the vehicle may be pushed to a location that does not present a traffic hazard.
>> . . .
>> 6.    Vehicles may be towed and impounded for safekeeping with the approval of the on-duty supervisor, if the vehicle is non-securable or not operable, and if the owner is not with the vehicle or cannot be contacted after confirming that the vehicle has not been associated with criminal activity.

(*Id.* § 9.45.04.)

In addition to defining the circumstances under which a vehicle may be

impounded, the Policy requires that all vehicles towed at the direction of an officer be documented in a case report and Vehicle Impound/Recovery Report. (*Id.* § 9.45.05.) The case report must include:

> the date/time and location of the incident, reason for removal or tow, requesting officer, name and location of the tow company, any charges pending, notification or attempted notification of the registered owner, an inventory list and location of any property removed from the vehicle for safekeeping.

(*Id.* § 9.45.05.A.1.)

All towed vehicles must be inventoried to document the contents and condition of the vehicle. (*Id.* § 9.45.05.C.) The Policy directs officers to remove and secure:

> a.    Money, valuables, or expensive jewelry[;]
> b.    Guns or other potentially volatile weapons, substances or items[;]
> c.    Contraband or items of evidentiary value[; or]
> d.    Any other items of unusual value, rarity, or fragility.

(*Id.*) Property taken from the vehicle is secured with the WRPD for safekeeping. (*Id.*)

Officer Levan confirmed that the general purpose of an inventory search is to document valuable items and protect WRPD from theft claims in the future. (Jan. Tr. at 13:27.) Officers may search all areas of the passenger compartment or anything where valuable items may be stored. (*Id.* at 13:28.)

Officer Rezac testified that WRPD officers are not trained to disassemble parts of the vehicle during an inventory search. (Nov. Tr. at 10:24–25.) He stated that if part of the vehicle appears to have been altered or accessed, he will check that area to determine whether something is hidden. (*Id.* at 10:25.) However, if a component does not appear to have been altered, Officer Rezac would not disturb it. (*Id.* at 10:26.)

9

Officer Lovan testified that finding an empty firearm holster would change the scope of the search because of the likelihood of the presence of a "high-dollar dangerous item" that should be listed on the inventory. (Jan. Tr. at 13:30.) He stated that the officers would look in additional areas where a firearm could be held or stored in a vehicle out of concern for public and officer safety. (*Id.* at 13:31.) Officer Cotten agreed that finding an empty firearm holster would cause officers to suspect a firearm was in the vehicle and to be concerned for safety. (*Id.* at 13:57.)

**D.     Procedural History**

Kendall filed the instant motion to suppress on June 19, 2018, and briefing was complete on July 30, 2018. (ECF Nos. 33, 37 & 41.) On September 20, 2018, Kendall filed a "clarification" of the Motion that provided further detail on the location of the drugs and argued that the drugs should be suppressed because they were located underneath the center console. (ECF No. 46.)

The Court held an evidentiary hearing on November 6, 2018. (ECF No. 54.) Officers Rezac and Cotten testified. At the conclusion of the hearing, the Court took the Motion under advisement.

On November 16, 2018, Kendall filed a "Motion to Supplement the Record or in the Alternative to Reopen the Record." (ECF No. 56.) After that first hearing, defense counsel had apparently re-reviewed body camera of Officer Lovan and realized that the footage "capture[d] clear images of the paneling beneath the glove box prior to the search and the discovery of the handgun" and "calls into question Officer Cott[e]n's description of the paneling as 'ajar.'" (*Id.* at 2.) Despite the belated nature of the filing,

the Court ordered the Government to conventionally submit Officer Lovan's body worn camera footage to the Court, reopened the record, and scheduled a supplemental evidentiary hearing.  (ECF Nos. 61, 63 & 64.)

The Court held the Supplemental Evidentiary Hearing on January 31, 2019, at which Officers Levan and Cotten testified.  (ECF No. 68.)  The Court once again took the Motion under advisement.

## II.  BURDEN OF PROOF

On a motion to suppress evidence obtained from a warrantless search or seizure, the defendant bears the burden of presenting a *prima facie* case that the Fourth Amendment has been "implicated," at which point the burden shifts to the Government to prove "that its warrantless actions were justified (*i.e.*, as a lawful investigatory stop, or under some other exception to the warrant requirement)."  *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); *see also id*. at nn.1–2 (citing authorities); 6 Wayne R. LaFave, *Search & Seizure* § 11.2(b), at n.35 and accompanying text (5th ed., Oct. 2018 update).

The briefing on the Motion reveals that Kendall's personal Fourth Amendment rights are implicated here.  He has therefore raised a *prima facie* case of a potential Fourth Amendment violation through a warrantless seizure, thus shifting the burden to the Government to justify the police officers' actions.

## III.  ANALYSIS

"Though impoundments and inventory searches often occur sequentially, they are subject to different legal standards."  *United States v. Sanders*, 796 F.3d 1241,

1244 n.1 (10th Cir. 2015).  The disposition of the Motion turns on the decision to impound the vehicle and the proper scope of the inventory search, which the Court will address in turn.

The Motion seeks to suppress all evidence, observations, and statements.  (ECF No. 33 at 1.)  However, Kendall did not brief any argument relating to suppressing any of his statements.  Indeed, the parties do not suggest that Kendall made any statement on which the Government now relies to support its charges.  At the November hearing, Kendall's attorney confirmed that he sought only to suppress the evidence found in the vehicle.  To the extent, therefore, that Kendall now moves in this Motion to suppress any of his statements, that portion of the Motion is denied.  As a consequence, the Court will address only the physical evidence discovered during the search of the vehicle.

## A.    Decision to Impound the Vehicle

Kendall argues that the officers' decision to impound the vehicle was not guided by a proper policy.  (ECF No. 33 at 4–5.)  A review of the policy and underlying facts shows otherwise.

After surveying Supreme Court and circuit precedent, as well as authority from sister circuits on impoundment, the Tenth Circuit held "when a vehicle is not impeding traffic or impairing public safety, impoundments are constitutional only if guided by both standardized criteria and a legitimate community-caretaking rationale." *United States v. Sanders*, 796 F.3d 1241, 1243 (10th Cir. 2015).  "The touchstone of the inquiry into whether an impoundment is lawful . . . [is] the existence of standardized criteria." *Id.* at

1249.  A police department policy may grant "police discretion over whether to impound

and inventory a vehicle . . . so long as officers exercise that discretion according to

standardized criteria, and not 'in bad faith or for the sole purpose of investigation.'"

*United States v. Taylor*, 592 F.3d 1104, 1108 (10th Cir. 2010) (citing *Colorado v.*

*Bertine*, 479 U.S. 367, 372 (1987)).

      In addition, impoundment must be reasonable, not pretextual, and justified by a

legitimate community-caretaking rationale.  *Sanders*, 796 F.3d at 1243.  To determine

whether an impoundment is justified by a legitimate community-caretaking rationale,

courts consider the following, non-exclusive factors:

> (1) whether the vehicle is on public or private property; (2) if
> on private property, whether the property owner has been
> consulted; (3) whether an alternative to impoundment exists
> (especially another person capable of driving the vehicle);
> (4) whether the vehicle is implicated in a crime; and
> (5) whether the vehicle's owner and/or driver have
> consented to the impoundment.

*Id.* at 1250.  Protecting public safety and promoting efficient movement of traffic are

examples of community-caretaking functions.  *Id.* at 1245.

      In this case, impoundment of the vehicle was guided by the WRPD Policy.

Among other reasons, the Policy provides that a vehicle may be towed when the

vehicle is uninsured.  Here, there is no dispute that Kendall was unable to provide proof

of insurance.  (ECF No. 37-2, § 9.45.03(A)(6); Nov. Tr. at 9:52.)  The Policy also allows

impoundment when the driver or sole occupant is "otherwise incapacitated."  (ECF No.

37-2, § 9.45.03(A)(1).)  Here, again, there is no dispute that Kendall lacked a valid

driver's license and therefore could not legally drive the vehicle.  And finally, the Policy

provides that a vehicle may properly be towed and impounded for safekeeping if the vehicle is not operable, the owner of the vehicle cannot be contacted, and the officer obtains approval of the on-duty supervisor. (*Id.* § 9.45.04(A)(5).)

The hearing testimony unequivocally established that all of these circumstances were present here. Neither Kendall nor indeed anyone else could legally operate the vehicle because the vehicle lacked insurance. Although officers at the scene attempted to reach the vehicle's registered owner on at least two occasions—once using one of the officers' phones and once (with his consent) using Kendall's phone—they were unsuccessful. And finally, the officers at the scene contacted their sergeant and obtained approval to tow and impound the vehicle. Therefore, the decision to tow and impound the vehicle was without question justified under the Policy.

Moreover, impoundment of the Honda was justified by a "reasonable and legitimate, non-pretextual" purpose. *Sanders*, 796 F.3d at 1250. Several of the *Sanders* factors weigh in favor of the lawful impoundment of Defendant's vehicle. Kendall was alone in the vehicle when stopped and the officers could not reach the registered owner, despite trying multiple times. Eventually, when the owner contacted the officers, after the inventory search was completed but prior to the vehicle actually being towed, the owner did not voice any objection to the car being towed. Thus, there was no good alternative to impoundment, and the registered owner did not object to the towing and impoundment. *See United States v. Andas-Gallardo*, 3 F. App'x 959, 963 (10th Cir. 2001). In addition, Kendall's vehicle was stopped on a public street, and subject to public traffic laws. Because of its location, there was no person whom the police could consult about watching over the car.

14

It is true, however, that two factors weigh somewhat against impoundment. Despite the officers' initial suspicions, they determined that the vehicle had not been reported as stolen. The only other crime in which the vehicle was implicated was Kendall's unlicensed driving of an uninsured vehicle. However, the car was not necessary to prove that Kendall committed those violations. In addition, Kendall refused to consent to a search of the vehicle.

Nonetheless, after a careful balancing of the various *Sanders* factors, the Court concludes that impoundment of the vehicle was lawful and reasonable. This conclusion is amply supported given that Kendall was the sole occupant of a vehicle stopped on a public road, he was driving the vehicle without a valid driver's license, the vehicle was without insurance, there was no other passenger in the car who could legally drive the car even if it did have insurance, and law enforcement was unable to contact the registered owner, despite good faith efforts to do so. These facts, in the Court's view, substantially outweigh the countervailing circumstances the Defendant has relied on.

Before leaving this issue, the Court elects to consider the Defendant's contention that the Colorado Supreme Court's recent decision in *People v. Brown* supports a finding that vehicle impoundment in factually similar circumstances is unlawful. 414 P.3d 815 (Colo. 2018). It must first be made clear, however, that pronouncements by a state court on matters of federal constitutional law are not binding on federal courts. *United States v. Madden*, 682 F.3d 920, 927 (10th Cir. 2012) ("This court is not bound by a state court's interpretation of the Fourth Amendment. . . . Whether an arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended." (internal quotation marks

omitted)).  Nonetheless, given that the Tenth Circuit may in the future elect to consider *Brown* as persuasive authority on the issue of lawful vehicle impoundment in similar factual settings, the Court will address and distinguish *Brown*.

In *Brown*, the Colorado Supreme Court found that impoundment of a vehicle was not justified when the driver was "merely cited for . . . driving under suspension or otherwise without a valid license," and there was no "reason to believe that he will be unable to make arrangements sufficient to prevent the vehicle from 'impeding traffic or threatening public safety and convenience.'"  415 P.3d at 820.  The court reasoned that

> [a]lthough the officers may have reason to suspect that the driver will unlawfully drive the vehicle upon their departure, the community caretaking exception to the probable cause and warrant requirements of the Fourth Amendment definitionally cannot support seizures on the basis of suspicion that the driver has committed, is committing, or will commit a crime.

*Id.*

The factual circumstances in the instant case are distinguishable.  Kendall was driving without a valid license.  However, despite their efforts, the police were unable to contact the registered owner of the vehicle or a licensed driver.  Thus, unlike in *Brown*, the WRPD officers had reason to believe that Kendall would be unable to make arrangements for the safe onward transport of the vehicle.  Moreover, because the vehicle lacked insurance, neither Kendall nor any other driver could lawfully operate the vehicle.  Unlike in *Brown*, where the police may have suspected that the defendant (as opposed to someone else) would continue to drive the vehicle and endanger public safety, here, no driver—even a licensed driver—could lawfully operate the uninsured

16

vehicle. *See United States v. Hannum*, 55 F. App'x 872, 876 (10th Cir. 2003) (finding

that lack of proper registration and insurance justified impoundment of vehicle because

it could not lawfully be driven). Thus, *Brown* is factually distinguishable from the instant

case, and its analysis does not persuade this Court that impoundment of Kendall's

vehicle violated the Fourth Amendment. For all these reasons, therefore, the Court

concludes that the decision to impound was justified by standardized WRPD policy and

a legitimate caretaking rationale, and a result was lawful.

**B.     Scope of Inventory Search**

Inventory searches are a "well-defined" exception to the warrant requirement of

the Fourth Amendment. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). "It is common

practice for police to conduct an inventory of the contents of vehicles they have taken

into their custody or are about to impound." *United States v. Tueller*, 349 F.3d 1239,

1243 (10th Cir 2003). Warrantless inventory searches of an impounded vehicle serve

three distinct administrative purposes: (1) protecting an owner's property stored in the

vehicle; (2) protecting the police against claims of lost or stolen property; and (3)

protecting the police from potential danger. *South Dakota v. Opperman*, 428 U.S. 364,

369 (1976); *United States v. Lugo*, 978 F.2d 631, 636 (10th Cir. 1992). Moreover,

inventory searches of vehicles may also be justified by "concern for the safety of the

general public." *Lugo*, 978 F.2d at 635 (internal quotation marks omitted).

Although inventory searches need not be supported by a warrant or probable

cause, they are restricted in other ways. First, the search is reasonable only if

conducted pursuant to "standard police procedures" for the purpose of protecting the

vehicle and its contents. *Id.* at 636; *Bertine*, 479 U.S. at 371. Standardized criteria or established routine regulating inventory searches are necessary to assure that an inventory search is not "a ruse for a general rummaging in order to discovery incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). Thus, in *Opperman*, the Supreme Court found that the police acted reasonably when, pursuant to the police department's standard procedures, they performed an inventory search of an unlocked glove compartment of an abandoned vehicle. *Opperman*, 428 U.S. at 367.

Second, "[t]he policy or practice governing inventory searches should be designed to produce an inventory." *Wells*, 495 U.S. at 4. In other words, an inventory search must be justified by the administrative purposes of such a search. "To be justified as an inventory search . . . the search cannot be investigatory in nature but must instead be used only as a tool to record the defendant's belongings to protect the police from potential liability." *United States v. Edwards*, 242 F.3d 928, 938 (10th Cir. 2001).

1. *Inventory Search in* United States v. Lugo

Whether an inventory search allows an officer to look in areas of a vehicle that are not traditionally used for storage is a fact-dependent inquiry. The Tenth Circuit evaluated such a search in *Lugo*, the facts and holding of which are instructive here.

In *Lugo*, the defendant informed the officer that he had a firearm inside his truck behind the driver's seat. 978 F.2d at 633. After the defendant was handcuffed and taken to the police station, an officer commenced his inventory search of the truck and quickly located the firearm and ammunition. *Id.* Exiting the truck, the officer noticed the passenger door panel was a half-inch ajar and there was an opening where a speaker

18

would be (but no speaker). *Id.* The officer "bent back the door panel along the existing crease" and found a paper bag with two bricks of cocaine inside. *Id.* at 634. He later explained that removing a speaker cover to look inside a door panel was not part of a routine inventory search. *Id.*

In *Lugo*, the Tenth Circuit recognized that

> [l]ocal police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Id.* at 635 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). "Noninvestigatory searches of automobiles pursuant to this function . . . do not offend Fourth Amendment principles so long as such activities are warranted 'in terms of state law and sound police procedure' and are justified by 'concern for the safety of the general public who may be endangered if an intruder removed' a weapon which police reasonably believed was present and located in a part of the vehicle vulnerable to vandals." *Id.* The Tenth Circuit thus concluded that removing the firearm—that defendant had proactively told officers was in the vehicle—was a "community caretaking task." *Id.*

However, the Tenth Circuit also concluded that retrieving a paper sack from a cavity between the door panel and door was not part of the community caretaking function. *Id.* at 636. "[S]earching behind the door panel of a vehicle does not qualify as 'standard police procedure' and does not serve the purpose of 'protecting the car and its contents' under any normal construction of those terms, at least on the evidence in

this record." *Id.* In so finding, the Tenth Circuit cited the lack of testimony in the record and absence of findings by the district court that the officer suspected the presence of a weapon in the door cavity search or that the officer was attempting to protect the public from vandals obtaining a weapon. Under the circumstances, searching in the cavities of the car went beyond the scope of an inventory search.

      2.   *Drugs under the Center Console*

Kendall relies on *Lugo* to argue that the drugs found beneath the center console should be suppressed. (ECF No. 33 at 4.) Specifically, Kendall argues the officers "had to physically pry up a panel" to remove the bottom panel of the center console and thus impermissibly searched an area designed to "give a person access to the inner workings of the car." (ECF No. 42 at 1.) Based on *Lugo*, Kendall argues that searching the interior workings of the vehicle does not serve the purpose of protecting the car or its contents. (*Id.* at 1–2.) However, at the November hearing, Kendall conceded that there was a difference between searching beneath the center console in pristine condition and a console with the plastic molding altered and sticking up, with a plastic baggie visible underneath. (Nov. Tr. at 11:41.)

Significant and obvious alterations to the passenger compartment that require little to no effort to move can transform the inner workings of a vehicle into a non-traditional storage area in the passenger compartment. For example, one court in this circuit found that removing a loose cup holder in a center console—that "lifted up freely in [the officer's] hands, without force and without manipulation"—did not initiate a *Lugo*-type of intrusion because department policy instructed officers to document all personal

property inside the vehicle including property in closed compartments. *United States v. Cruz*, 2011 WL 13289808, at *10 (D.N.M. Apr. 27, 2011). Another court found that "[w]hile the space beneath the center console insert was not specifically manufactured to be used for storage, in this case, the center console was modified so that the space beneath it could be used as a hidden storage compartment." *United States v. Corral-Estrada*, 2007 WL 2572371, at *5 (D. Utah Sept. 4, 2007). That court thus upheld a search incident to arrest in which the officer "discovered the compartment when he merely lifted the bucket out of the console, without using force, revealing a storage area" where he found suspected drugs and associated paraphernalia. *Id.*; *see United States v. Dixon*, 2010 WL 3167381, at *1–2 (W.D.N.Y. May 26, 2010) (finding that a similar search beneath a loose center console was justified both as a search incident to arrest and an inventory search).

Officer Cotten testified that the bottom portion of the center console was not affixed and that he could see a small plastic baggie sticking out of one side. *See United States v. Martinez*, 512 F.3d 1268, 1275 (10th Cir. 2008) ("[O]pening a visible storage compartment . . . with some duct tape coming out . . . is different from prying open car door panels not meant to be opened."). The body camera footage from Officer Lovan confirms that the bottom of the center console was slightly raised and not affixed. Both officers, with no real effort, were able to lift the bottom console panel to reveal the drugs. It was thus obvious to the officers that the center console had been modified such that the area beneath it was being used as a storage compartment within the passenger area of the vehicle, a compartment capable of storing valuables.

Moreover, whereas there was no testimony in *Lugo* to suggest that the officer suspected valuables behind the door panel or otherwise acted pursuant to department policy, Officer Cotten testified that it was WRPD Policy to search in locations where valuables could be kept. The center console is such a place, and Officer Cotten explained that he looked in, and then beneath, the console for the purpose of securing any valuables. Based on the body camera footage and the testimony of Officers Cotten and Levan, the Court finds that the area beneath the center console had been altered to become an additional storage component capable of storing valuables, and Officer Cotten searched that area consistent with WRPD Policy. Because the inventory search of the center console did not violate the Fourth Amendment, the Court denies the Motion as to the drugs located in the center console.

3.      *Gun Behind the Panel Below the Glove Compartment*

Kendall also relies on *Lugo* to argue that the gun found behind the panel below the glove compartment should be suppressed. (ECF No. 33 at 4.) Specifically, Kendall argues that, as in *Lugo*, removing paneling from the vehicle goes beyond the scope of an inventory search and is in excess of the search permitted by the Policy. (ECF No. 33 at 3–4.) In response, the Government argues that the purpose and extent of the inventory search differed from that in *Lugo*. Specifically, the purpose of the inventory search of Kendall's vehicle was "to protect the officers from potential danger." (ECF No. 37 at 14.) The Court agrees with the Government that the circumstances differ from *Lugo* such that the inventory search of the panel below the glove compartment was justified.

Searching for firearms reasonably known to be in the passenger compartment of an impounded vehicle serves two administrative purposes: insuring against future theft claims, and protecting officer and public safety by securing firearms stored in accessible places of an impounded vehicle. *See United States v. Moraga*, 76 F. App'x 223, 229 (10th Cir. 2003) (holding that valid justifications for an inventory search include safeguarding property and checking for dangerous items). In *Cady*, the Supreme Court found an inventory search of a vehicle's trunk—"vulnerable to intrusion by vandals"—to be valid when officers reasonably believed that the owner's service revolver was in the car and it had not yet been recovered. 413 U.S. at 448. Indeed, in *Lugo*, the Tenth Circuit concluded that removing a firearm was within the scope of the inventory search. 978 F.2d at 636. Similarly, the Ninth Circuit concluded that an inventory search of a briefcase in a car was appropriate because the police found an empty holster and thus reasonably believed that a weapon was in the car. *United States v. Feldman*, 788 F.2d 544, 552 (9th Cir. 1986).

After Officer Cotten located an empty gun holster on the front passenger seat, he had reasonable grounds to suspect that there remained a firearm in the vehicle. (Jan. Tr. at 13:31, 13:56.) The lack of firearm in the concealed carry holster caused Officers Cotten and Lovan to be concerned for officer and public safety because of the substantial likelihood that a weapon was stowed somewhere in a vehicle which was about to be towed. The instant case is thus materially distinguishable from *Lugo*, where the police officers *had already located and neutralized the weapon known the be in the vehicle* when they searched to interior components. As a result, in *Lugo*, the public and

officer safety justification had ceased to exist, and the subsequent inventory search could only be justified by other administrative, non-investigative purposes. Here, in stark contrast, at the time Officer Cotten located the empty firearm holster, the WRPD officers had a good faith reason to suspect that there was still a firearm in Kendall's vehicle.

Moreover, as discussed above, visible alterations to the interior compartment of the vehicle created additional storage areas where valuables could be secured. At the supplemental evidentiary hearing, Officer Cotten testified that his attention was drawn to the panel below the glove compartment, the bottom portion of which was not fully connected to the center console, after he had located an empty gun holster on the passenger seat immediately in front of that location. (Jan. Tr. at 13:42; Nov. Tr. at 10:50–51.) Officer Cotten thus had reason to suspect that a firearm was in that immediate vicinity, creating a non-traditional storage area in the passenger compartment where a firearm or valuables could be stored. Thus, consistent with WRPD Policy, Officer Cotten searched the area and quickly identified the butt of a handgun tucked into the gap between the panel below the glove compartment and the center paneling in the vehicle. Because the search of the panel was justified by the officer and public safety purposes of an inventory search, and was consistent with WRPD Policy, the Court denies the Motion as to the firearm recovered from the vehicle.

4.   *Backpack*

Established police department "policies of opening all containers or of opening no containers are unquestionably permissible." *Wells*, 495 U.S. at 4. The absence of a policy related to closed containers may render a search unconstitutional. In *Wells*, the

Supreme Court found that the Florida Highway Patrol had "no policy . . . with respect to the opening of closed containers encountered during an inventory search," and thus the search of a closed container during a vehicular inventory search was "not sufficiently regulated." *Id.* at 4–5.

The Government relies on *United States v. Creighton* and *Colorado v. Bertine* to support the officers' decision to search the backpack. *United States v. Creighton*, 639 F.3d 1281, 1285 (10th Cir. 2011); *Bertine*, 479 U.S. 367. In *Bertine*, the Supreme Court upheld the search of a backpack in a van during an inventory search where the police department had a policy that mandated a "detailed inventory involving the opening of containers and the listing of [their] contents." 479 U.S. at 370 & n.6. Similarly, in *Creighton*, the Tenth Circuit upheld an inventory search by the Greenwood Village Police Department of the interior of the defendant's luggage, which was sitting in a parking lot. The police department's guidelines required "an itemized inventory of all personal property" entering the department's possession. *Id.* at 1284. The court found that the officers operated pursuant to standard procedure and the inventory search was not a ruse for rummaging. *Id.*

The WRPD Policy at issue here states that when a vehicle is towed, officers must inventory the contents and may take and secure for safekeeping money, guns, valuables, contraband, and any "items of unusual value, rarity, or fragility." (ECF No. 37-2, § 9.45.05(C)(1).) Kendall claims that this Policy would not allow officers to search the interior of the backpack. (ECF No. 33 at 5.) The Government argues that "money,

valuables, or expensive jewelry could be located in a container," so it was consistent with the Policy to open the backpack, inventory items, and secure valuable items.

While the Policy is not particularly detailed and does not directly address the opening of containers, it clearly directs officers to inventory the contents of the vehicle and remove valuable or rare items for safekeeping. As the Tenth Circuit held in *Creighton*, such a policy can justify opening closed containers to inventory personal property. 639 F.3d at 1284. At the hearing, Officer Cotten testified that WRPD's "overall policy" guided his search of the backpack. He explained that he "need[ed] to be able to establish that there's not any money or any diamonds or any valuable items in that backpack that I can't leave in the car," which would need to be booked into evidence for safekeeping. (Nov. Tr. at 11:18.) Because the purpose of Officer Cotten's search was consistent with WRPD procedure and for the administrative purpose of protecting the police against future claims of lost or stolen property, the search of the closed backpack did not violate the Fourth Amendment. *See South Dakota v. Opperman*, 428 U.S. at 369. The Court also denies Kendall's Motion with respect to the backpack.

## C.    Search Incident to Arrest and Inevitable Discovery

Because the Court has denied each part of the Motion to Suppress on the grounds that impoundment and the subsequent inventory search did not violate the Fourth Amendment, the Court need not consider whether the search was permissible as a search incident to arrest, or whether the evidence would have been inevitably discovered pursuant to a hypothetical proper inventory search. *See United States v.*

*Haro-Salcedo*, 107 F.3d 769, 773 (10th Cir. 1997)) ("If evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence would be admissible." (internal quotation marks omitted and alterations incorporated)).

## IV. CONCLUSION

For the foregoing reasons, Kendall's Motion to Suppress (ECF No. 33) is DENIED.  By way of separate order, the Court will rule on Defendant's pending Unopposed Motion for an Ends of Justice Continuance (ECF No. 69), and therein set new dates for a jury trial and Final Trial Preparation Conference.

Dated this 11th day of February, 2019.

BY THE COURT:

William J. Martinez
United States District Judge